UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

CEDRIC MONTEZ SMITH,

                  Petitioner,                Case No. 1:10-cv-186

v.                                      Honorable Janet T. Neff

SHIRLEE HARRY,

                  Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On October 13, 2005, a Genesee County jury convicted Petitioner of eight criminal charges: larceny from a motor vehicle, MICH. COMP. LAWS § 750.356a(1); armed robbery, MICH. COMP. LAWS § 750.529; discharge of a firearm from a motor vehicle, MICH. COMP. LAWS § 750.234a; two counts of assault with a dangerous weapon (felonious assault), MICH. COMP. LAWS § 750.82; carrying a concealed weapon, MICH. COMP. LAWS § 750.227; being a felon in possession of a firearm, MICH. COMP. LAWS § 750.227f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. Petitioner was sentenced on November 14, 2005, as a fourth felony offender, MICH. COMP. LAWS § 769.12, to the following terms of imprisonment: 10 to 25 years on the armed-robbery offense, 2 years on the felony-firearm offense, and 4 to 15 years on each of the remaining offenses. In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I.  THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR LARCENY OF A VEHICLE AND ARMED ROBBERY.

II.  THE TRIAL COURT VIOLATED DEFENDANT-APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO EQUAL PROTECTION BY EXCLUDING A JUROR OF HIS RACE.

III.  PETITIONER'S CONSTITUTIONAL DOUBLE JEOPARDY, DUE PROCESS AND EQUAL PROTECTION GUARANTEES [WERE VIOLATED] WHERE HE RECEIV[E]D NO CREDIT AGAINST THE NEW MINIMUM SENTENCES FOR CRIMES COMMITTED WHILE ON PAROLE, US CONST, AMS V, XIV; CONST 1963, ART 1, 15, 17, 20.

IV.  THE TRIAL COURT COMMIT[ED] PLAIN ERROR IN FAILING TO INSTRUCT THE JURY THAT IT SHOULD VIEW WITH CAUTION THE TEST[I]MONY OF WITNESS[ES] WHO WOULD BE ACCOMPLICES TO PETITIONER'S ALLEGED CRIME; THUS DE[N]YING PETITIONER HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

(Pet. at 6-10, docket #1, Page ID##6-10.)  Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are either noncognizable, procedurally defaulted or have no merit.  Upon review and applying the AEDPA standards, I find that all grounds are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from a May 28, 2005 incident that began outside the Genesee Valley Mall and ended after a vehicle chase, during which gunshots were fired.  Petitioner was charged with all of the offenses of conviction, with the exception of the two felonious assault charges.  Following a preliminary examination held June 21, 1996, Petitioner was bound over on all six charges.  (6/21/05 P.E. Tr. at 28, docket #10.)  At a hearing held August 1, 2005, the trial court denied Petitioner's motion to quash the armed-robbery count.  (8/1/05 Hr'g Tr. at 6-7, docket

#13.)  On August 9, 2005, the prosecution indicated that, because Petitioner had rejected a plea offer, the prosecution was moving to remand the case to district court to add three counts of felonious assault for the passengers in the car at which shots were fired.  The motion was granted.  (8/9/05 Hr'g Tr. at 3-6, docket #15.)  A second preliminary examination was held on August 30, 2005, at which Petitioner was bound over on the additional two counts of felonious assault.  (8/30/05 Prelim. Exam. Tr. at 32, docket #16.)  Petitioner was arraigned in circuit court on September 6, 2005 on all eight counts, and Petitioner acknowledged receipt of a supplemental information charging him with being a fourth felony offender, which significantly impacted the maximum penalties to which he was exposed, as explained to him during arraignment.  (9/6/05 Arraignment Tr. at 3, 6-8, docket #17.) At the final pretrial conference, Petitioner rejected a plea offer of two five-year terms on one count of attempted armed robbery and one count of felon-in-possession in exchange for dismissal of the remaining counts and the sentencing enhancement.  (8/30/05 Hr'g Tr. at 4-6, docket #18.)

Trial began October 12, 2005.  During voir dire, the prosecutor used his first peremptory challenge to remove an African-American juror, after the juror expressed some dissatisfaction with the failure of the police to arrest the persons who broke into the juror's house fifteen years before.  (Tr. I at 26-27, 46, 97-98.)  The court concluded that the prosecutor had demonstrated a racially neutral reason for the exercise of his peremptory challenge.  (*Id.* at 98.)

Michigan State Police Trooper Rick Kane testified that, on May 28, 2005, at about 1:10 p.m., he was traveling southbound on I-75 near the Corunna Road exit, driving a fully marked police cruiser.  (*Id.* at 100-01.)  He received a radio dispatch regarding a larceny at the Genesee Valley Mall, a subsequent chase, and the possible discharge of a firearm.  The suspect vehicle was described as a red Chevy Caprice.  Kane took the Corunna Road exit going westbound, and he

- 3 -

spotted the vehicle going eastbound on Corunna near Algonac Street. At this point, Kane could not see how many people were in the vehicle. Kane turned his car around and called 911 to report spotting the vehicle. He followed the vehicle as it turned on Algonac and saw it stop in a private drive about 75 to 100 yards down the road. (*Id.* 101-02.) As he approached the vehicle, he saw a black male wearing a white shirt and black skull-cap-type head rag get out of the vehicle and run across the street in front of Kane's car and toward the back of a house containing an air-conditioning unit. Two other persons remained seated in the car's driver and front passenger seats. (*Id.* at 102-03, 107.) Kane identified pictures of the scene and car. (*Id.* at 108-12.) Kane checked that the rear windows worked, but he could not remember whether either window was down at the time of the stop. (*Id.* at 110-12.)

Kane testified that, when he stopped the vehicle, Jarvelle Thames was in the driver's seat and Antwan Sturgess was in the front passenger seat. (*Id.* at 113.) Kane handcuffed both individuals and placed them in the rear of the police vehicle. (*Id.* at 127.) When he searched the vehicle, Kane found a radio/CD player and a Walmart bag containing two pairs of new Dickie work shorts on the right rear floorboard of the passenger compartment. (*Id.* at 114,116-17.) Kane also found pliers on the driver's seat and a screwdriver in Jarvelle Thames' right front pants pocket. (*Id.* at 114, 118.) Kane had the car impounded. The following day, he conducted a more thorough search of the vehicle, locating an unspent .32 caliber cartridge and a cartridge holder that fit the recovered cartridge. (*Id.* at 119-20.)

Brandon Reeves testified that, on May 28, 2005, he drove his Monte Carlo to the Genesee Valley Mall with his uncle Berry Valentine, his brother Marlon Austin and his cousin Jonathan Donald. (*Id.* at 129-30, 133-34.) Prior to going to the mall, the four had gone to Walmart,

where Jonathan Donald had purchased two pairs of shorts.  Reeves identified the shorts retrieved by Trooper Kane as the shorts purchased by Donald.  (*Id.* at 132.)  Reeves and the others went into the mall to return a game, and they were inside for only five or six minutes.  (*Id.* at 133.)  As he returned to his car, he could see that his CD player was missing.  (*Id.* at 137-38.)  Reeves saw a Chevy Caprice parked next to the passenger side of his car.  A man he recognized as Jarvelle was crouched beside the Caprice, acting like he was checking his tire.  (*Id.* at 138-39.)  Another man was in the front passenger seat, and a third man was seated in the back of the car.  He did not recognize the front-seat passenger, but he had seen the back-seat passenger in the past.  Reeves identified Petitioner as the person seated in the back seat.  (*Id.* at 140-41.)  On the day of the incident, Petitioner was wearing a black do-rag and glasses.  (*Id.* at 142.)  Reeves asked Jarvelle where his CD player was, and he obtained permission to look inside the Caprice.  (*Id.* at 140.)  As Reeves walked around his own car and approached the driver's side of the Caprice, Jarvelle moved toward the open driver's door, squeezing past Reeves.  Jarvelle jumped in the Caprice.  Reeves attempted to turn the engine off, but Jarvelle put the car in gear and drove away.  (*Id.* at 143-46.)  Reeves picked up his cell phone.  He told his passengers to get in his Monte Carlo.  Reeves then put his car in gear and began chasing the Caprice.  (*Id.* at 147-48.)  He saw the Caprice turn right at the stop sign near the Cinema 10.  (*Id.* at 149.)  Reeves was about one block behind the Caprice at the turn, but he subsequently caught up to within a car's length.  (*Id.* at 152.)  Reeves wanted to get the license plate number, but he was unable to do so.  He intended to call the police as soon as he had the number.  (*Id.* at 153.)  As they passed the first house, Reeves saw the man in the back seat put his hand out of the back passenger window of the Caprice.  The man was holding a black handgun and began firing.  Reeves slammed on the brakes and came to a complete stop.  (*Id.* at 154, 156-57.)

Reeves then called the police and reported what had happened, describing the brown Caprice. (*Id.* at 159.) While Berry Valentine continued to talk with the police, Reeves started following the car again, but he stayed about a block behind. (*Id.* at 160, 169.) Jarvelle made a left turn onto Miller Road, heading back toward the mall. He turned right toward the mall lot and then continued northbound on Linden Road. (*Id.* at 161.) Once on Linden Road, Reeves got closer to the vehicle so that Berry could get the license number. ((*Id.* at 169.) Jarvelle turned on the road leading to the Walmart and then turned left again toward the Showcase Cinemas. (*Id.* at 162-63, 170.) At this point, Reeves heard the police sirens and he stopped following the Caprice. (*Id.* at 164.) Reeves drove to his Uncle Berry's home, where he received a phone call from the police five minutes later. The police asked Reeves to come back to where the police car had stopped the Caprice. Reeves was shown and identified his CD player and Jonathan's shorts. (*Id.* at 165.) He did not see who was being held in the police car. (*Id.* at 165.)

Fifteen-year-old Jonathan Donald testified to essentially the same facts as Reeves. (*Id.* at 176-95.) Donald also recognized Jarvelle. (*Id.* at 178.) He did not recognize either passenger, though he noticed that the back seat passenger was wearing a white shirt, a black do-rag and glasses. (*Id.* at 181-82, 189.) Donald could not identify Petitioner. (*Id.* at 182-83.) Donald was looking at his phone when the arm came out of the rear passenger window of the front car. After the first shot went off, Donald looked up and saw the arm sticking out of the window. Reeves slammed on the brakes and everyone in the car ducked down. (*Id.* at 187.) In contrast to Reeves, Donald testified that they did not receive a call from police for 20 or 30 minutes. (*Id.* at 192.) Donald identified his shorts. (*Id.* at 194.) According to Donald, after the license plate was relayed to the police, Reeves was instructed to quit following the Caprice. At that time, they were driving

on Miller Road.  Reeves stopped chasing the Caprice, but continued on Miller Road to get to Berry Valentine's house.  (*Id.* at 196-97.)

Jarvelle Thames testified that, on May 28, 2005 at 1:10 p.m., he was at the Genesee Valley Mall with Deantwan Sturgess and Petitioner.  Both Petitioner and Deantwan are Jarvelle's cousins.  Petitioner was sitting in the back, on the driver's side.  (*Id.* at 205, 208.)  Jarvelle was driving his orange Caprice Classic, and he identified the vehicle in various pictures.  (*Id.* at 206.)  Jarvelle pulled into the mall and parked next to another vehicle.  He went to the other car and took the radio and the shorts.  (*Id.* at 207, 210.)  He put the radio under the front seat, and the bag containing the shorts in the back seat.  (*Id.* at 209-10.)  The occupants of the other vehicle came out of the mall.  Jarvelle recognized Brandon Reeves.  (*Id.* at 208.)  When Reeves asked about the radio, Jarvelle denied having it.  (*Id.* at 209.)  Jarvelle testified that Reeves did not ask to look in Jarvelle's car and Jarvelle denied giving Reeves permission to do so.  (*Id.*)  Reeves tried to take Jarvelle's keys, so Jarvelle jumped in the car and put it in gear.  (*Id.* at 210.)  Jarvelle turned left behind the mall and took a side street through a subdivision to Miller Road.  While they were in the subdivision, Deantwan Sturgess pulled a small .32 caliber automatic pistol from under the front seat, turned and put his knee on the front seat and began firing while hanging out the back window.  (*Id.* at 211-14.)  He fired a total of two or three shots.  (*Id.* at 214.)  Prior to the shooting, Jarvelle was not aware that Sturgess had a gun.  (*Id.* at 213-14.)  According to Jarvelle, the front passenger window of the Caprice did not work.  The rear windows, however, worked by pushing the buttons in the back seat, but not from the driver's position.  (*Id.* at 215-16.)

After the shots were fired, the car that had been following dropped back.  Jarvelle Thames drove through the mall and down Linden Road.  He then turned right on Corunna Road.

When he saw the police, he turned down a side street and pulled into a driveway.  (*Id.* at 217.)
When Reeves stopped, Petitioner jumped out of the car and ran.  (*Id.* at 219.)  Jarvelle Thames did
not know what became of the gun.  (*Id.* at 220.)  Shortly thereafter, the police found the radio and
shorts in the car, and they took both Jarvelle Thames and Deantwan Sturgess into custody.  (*Id.* at
220-21.)  Jarvelle admitted that he had taken both the radio and the shorts without permission.  He
pleaded guilty to larceny from a motor vehicle, and that conviction was final.  (*Id.* at 221.)  He also
acknowledged that he originally had given a different story to Trooper Kane, telling Kane that
Petitioner had told Jarvelle to take the items.  (*Id.* at 222.)  He also acknowledged that he lied when
he told Kane that he could not hear the gunshots at the time they were fired, given the loudness of
the radio.  (*Id.*).  Later that same day, in the presence of his mother, Angela Moore, Jarvelle told
Sergeant Sipes that the radio was so loud that he could not have heard Petitioner fire the gun if he
did.  (*Id.* at 223.)  Jarvelle admitted that he had previously denied knowing anything about a gun or
ammunition in his car and that he had never indicated that Deantwan Sturgess had a gun.  (*Id.*)  He
also admitted that, on June 3, 2005, Jarvelle, accompanied by his mother, spoke with Sergeant Sipes
again.  At that time, Jarvelle told Sipes that Petitioner had fired shots from the back window, that
Jarvelle did not know Petitioner had a gun, and that Petitioner ran from the car when they were
stopped by police.  Both Jarvelle and his mother signed the statement Sgt. Sipes wrote down,
including a statement that the recorded facts were the truth.  (*Id.* at 224-25.)

　　　　　Berry Valentine testified that, on May 28, 2005 at 1:10 pm., he was in the parking
lot of the Genesee Valley Mall with Brandon (Reeves), Jonathan (Donald) and Marlon (Austin).
(*Id.* at 234.)  They had been inside the mall for 30 minutes or so.  When they came out, he saw a car
parked next to the one Reeves had been driving.  A young man was bending down, apparently

checking his tires.  (*Id.* at 235.)  When Reeves discovered his radio was missing, he reached into the other car.  The man squeezed between Reeves and the car, jumped in, and sped away.  According to Valentine, two other individuals were in the car.  Valentine identified Petitioner as the person in the back seat of that car.  (*Id.* at 235-37.)

Valentine testified that he, Reeves, Donald and Austin jumped in Reeves' car and followed the other vehicle.  (*Id.* at 238.)  Valentine was sitting in the front passenger seat.  As they followed the other car and turned into the neighborhood, Reeves' car drew within a car length of the other vehicle.  (*Id.* at 238-39.)  Reeves called 911 and was talking to the dispatcher.  He eventually handed the phone to Valentine.  As they drove, the backseat passenger, who Valentine identified as Petitioner, stuck his arm out of the right rear window and fired about three shots at Reeves' vehicle.  (*Id.* at 239-41, 247-48.)  When the gunshots started, Reeves braked and stopped the car.  (*Id.* at 240.)  After speaking with the dispatcher, Reeves took off again to see if they could catch the other vehicle.  After they got back to the mall, they stopped following the car.  (*Id.* at 242.)  Valentine testified that he described the vehicle for the dispatcher and tried to get the license number.  (*Id.* at 243.)  Reeves then drove the group back to Valentine's house.  Sometime thereafter, they received a call from the police, asking them to return to get descriptions of the vehicle.  When they reached the police, they saw the car they had been following.  (*Id.* at 243-44.)

Deantwan Sturgess was sixteen years old when he testified.  On the day of the incident, he was with Petitioner and Jarvelle Thames, both of whom are his cousins.  (*Id.* at 249.)  Sturgess had no purpose in going to the mall; he was just riding along.  Jarvelle was driving, Sturgess sat in the front passenger seat, and Petitioner sat in the back, on the passenger side.  (*Id.* at 250.)  When they got to the mall, Jarvelle got out and took the CD player from the car they were

parked next to.  (*Id.* at 251.)  Shortly thereafter, the occupants of the other car came out of the mall.

Sturgess did not know any of them.  One of them came up to the car, asked about his CD player,

looked in the car, and then tried to pull the keys from the car.  Jarvelle got back in the car and took

off.  (*Id.* at 252.)  According to Sturgess, the other car followed them and continued to chase them.

Sturgess took the gun from between the two front seats.  He opened the door a little and fired two

shots into the air.  (*Id.* at 254.)  The following car slowed down and dropped back.  (*Id.* at 262.)

Sturgess tried to hide the gun in the back seat.  (*Id.* at 266-67.)  When they turned the last corner and

Petitioner jumped out, the gun flew out the open door and landed in the grass.  (*Id.* at 254, 260-61,

263, 267-69.)  Sturgess claimed to have found the gun earlier that day, while he was cleaning the

trunk of the car in order to install speakers.  (*Id.* at 255-56.)  He and Jarvelle had bought the car a

couple of weeks before from a man on Marengo Street.  (*Id.* at 257.)  When the police arrived, they

found the radio and the shorts in the back seat.  (*Id.* at 270.)  Sturgess acknowledged that he made

a statement on the day he was taken into custody, denying having or shooting a gun.  (*Id.* at 271.)

He also acknowledged that, on May 31, 2005, in the presence of his guardian, Sturgess told Trooper

Kane that all three had decided to steal the radio.  Sturgess admitted that he previously told the

police officer that Petitioner had fired a black pistol at the car and then put the gun back inside his

waistband.  (*Id.* at 273-74.)  Jarvelle asked Petitioner why he had fired the gun and then told

Petitioner "just to go, go, go."  (*Id.* at 275.)  Sturgess admitted that he wrote a statement containing

those allegations, declared that it was the truth, and signed it in the presence of his guardian.  (*Id.*

at 276-77)  Sturgess testified that he had pleaded guilty to larceny from a motor vehicle, and that

both his and Jarvelle's cases were final.  (*Id.* at 277-78.)

Petitioner's girlfriend, Michelle Walker, testified that she had brought Petitioner his glasses the morning of trial, because she knew that he could not see without them. (*Id.* at 286.) Petitioner was not wearing glasses in court.

Marlon Austin testified similarly to Reeves, Donald, and Valentine about the overall course of events. Austin testified that, when the four came out of the mall, he saw and recognized Jarvelle. Austin stated that, like Reeves, he had known Jarvelle for years, but he did not know Jarvelle's last name. (*Id.* at 289.) He recognized Petitioner as the person in the back seat on the passenger side, and he identified Petitioner in court. (*Id.* at 291.) He believed there were a total of four people in the vehicle. (*Id.* at 292-93.) During the chase, Austin was watching the car in front of them. He saw Petitioner put his arm out of the rear window on the passenger side and fire three shots. (*Id.* at 299-301.) Austin could not see what type of gun was used, but he saw it pointed at the car he was in. (*Id.* at 301-02.) He both saw which window the arm came out of and saw that it was Petitioner. Petitioner was light-skinned, while the front passenger, whom Austin did not know was dark-skinned. (*Id.* at 302-03.) Austin was terrified by the shooting. Reeves hit the brakes, squealing the tires and leaving a skid mark. (*Id.* at 304.) After stopping, Reeves called the police and then followed well behind the other car until they got to Miller. (*Id.* at 305.) They then drove to Berry Valentine's house. (*Id.* at 307.) As they were leaving, they saw police cars going the opposite direction. (*Id.* at 312.)

Michigan State Police Sergeant Stephen Sipes testified that, on June 8, 2005, he went to Louie's Towing to look at the vehicle involved in the incident, which had been kept in a secured lot. He searched the car and found a fired .32 caliber cartridge case in the crack between the right rear seat and seat back. The case was located about twelve inches inside the right rear door. The

interior of the vehicle contained a lot of debris and was in disarray.  (Tr. II at 5-6.)  He identified Exhibit 15 as the cartridge he recovered from the car.  (*Id.* at 7.)

Trooper Kane was recalled to the stand.  He testified that, once he began following the car driven by Jarvelle Thames after it turned from Corunna onto Algonac, he had a clear view of the vehicle at all times.  At no time did any object leave the car, and no person left the vehicle until it had stopped in the driveway, when he saw a man run in back of the house.  Together with other officers, he searched the area from the corner of Corunna and Algonac to the tree line, looking for a gun.  No gun was found, even in the grassy area described by Sturgess. (*Id.* at 9-13.)

The prosecution rested, and Petitioner presented no witnesses.  (*Id.* at 15.)

At the conclusion of trial, on October 13, 2005, the jury found Petitioner guilty on all eight counts.  (*Id.* at 84-86.)  On November 14, 2005, Petitioner was sentenced as a fourth habitual offender to the following terms of imprisonment:  10 to 25 years on the armed-robbery conviction, 2 years on the felony-firearm conviction, and 4 to 15 years on each of the six remaining convictions.  (Sentencing Transcript (S. Tr.), at 7-8, docket #21.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on April 25, 2006, raised the first two issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #2.)  By unpublished opinion issued on January 24, 1997, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 1/24/97 Mich. Ct. App. Opinion (MCOA Op.), docket #25.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims presented to and rejected by the Michigan Court of Appeals. By order entered September 24, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #27.)

### C.    Post-conviction relief

On July 29, 2008, Petitioner filed a motion for relief from judgment in the Genesee County Circuit Court. In his motion, Petitioner raised five claims, the second and fourth of which are presented in this habeas petition: (1) that he was entitled under Michigan law to credit on his minimum terms for the time served prior to sentencing; (2) the failure to give him credit on his minimum terms for time served violated the Double Jeopardy, Due Process and Equal Protection Clauses of the federal constitution; (3) the assessment of minimum costs must be vacated as it was without statutory authority; (4) the trial court erred in failing to instruct the jury on the need for caution in viewing the testimony of accomplices, and this error violated Petitioner's right to present a defense; and (5) trial counsel was ineffective in failing to object to the denial of jail credit, failing to object to the imposition of minimum state costs, and failing to request a cautionary instruction about the unreliability of accomplice testimony. In an opinion and order issued September 26, 2008, the circuit court denied all issues on the merits. Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court. On March 9, 2009 and October 26, 2009, respectively, both courts denied leave to appeal on the ground that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).

- 13 -

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).  However, where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.   Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner contends that the evidence was insufficient to support his convictions for armed robbery and larceny from a motor vehicle. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d

1194, 1196-97 (6th Cir. 1988).  Moreover, because both the *Jackson* standard and the AEDPA apply

to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference

should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should

be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by

AEDPA.'"  *See Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541

F.3d 652, 656 (6th Cir. 2008)).

The Michigan Court of Appeals carefully and fully analyzed Petitioner's claim:

Defendant first argues that insufficient evidence was adduced at trial to support his armed robbery and larceny from a vehicle convictions.  We disagree.  The elements necessary to prove armed robbery are:  "(1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute."  *People v Ford*, 262 Mich App 443, 458; 687 NW2d 119 (2004) (internal quotation marks omitted; citations omitted).  The elements of larceny from a vehicle are:  (1) "that the defendant took a . . . radio . . . stereo . . . [or] electronic device"; (2) "that the property was taken without consent"; (3) "that when [the property] was taken, the property was in . . . a motor vehicle"; (4) "that there was some movement of the property"; and (5) "that at the time the property was taken, the defendant intended to permanently deprive the owner of the property."  See CJI2d 23.5.  Defendant was charged alternatively as a principal or on an aiding and abetting theory.  To convict under an aiding and abetting theory, the prosecution must prove the following:

[](1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement."  [*People v Moore*, 470 Mich 56, 67-68; 679 NW2d 41 (2004), quoting *People v Carines*, 460 Mich 750, 768; 597 NW2d 130 (1999) (alteration by *Moore*).]

In resolving a sufficiency challenge, the Court should not intrude on the jury's authority to determine the weight of evidence and assess the credibility of witnesses. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748, amended on other grounds 441 Mich 1201 (1992).  A prosecutor "need not negate every reasonable theory" of innocence.  *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

- 17 -

Further, an actor's state of mind may be inferred from circumstantial evidence. *People v Grayer*, 235 Mich App 737, 743; 599 NW2d 527 (1999).

MCL 750.529, the armed robbery statute, was amended, effective July 1, 2004, to read as follows:

> A person who engages in conduct proscribed under section 530 and who in the course of engaging in that conduct, possesses a dangerous weapon or an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon, or who represents orally or otherwise that he or she is in possession of a dangerous weapon, is guilty of a felony punishable by imprisonment for life or for any term of years. If an aggravated assault or serious injury is inflicted by any person while violating this section, the person shall be sentenced to a minimum term of imprisonment of not less than 2 years.

MCL 750.530 was amended, effective July 1, 2004, to read as follows:

> (1) A person who, in the course of committing a larceny of any money or other property that may be the subject of larceny, uses force or violence against any person who is present, or who assaults or puts the person in fear, is guilty of a felony punishable by imprisonment for not more than 15 years.

> (2) As used in this section, "in the course of committing a larceny" includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property.

Under the clear language of the statutes effective at the time the crimes in issue were committed, a defendant can be found guilty of armed robbery if the defendant was armed with a dangerous weapon and committed an assault "in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.530(2). *See People v Morson*, 471 Mich 248, 264-265; 685 NW2d 203 (2004) (Corrigan, C.J., concurring).

Reeves and his companions apparently came upon defendant and his companions shortly after the CD player was taken from Reeves's car. Reeves did not consent to the taking of the CD player. When confronted by Reeves, Thames drove off, with defendant in the rear passenger side seat. While Thames testified at trial that he took the CD player without telling defendant he was going to do so, he admitted to telling the police that defendant told him to take it. The stolen CD player

- 18 -

was found on the floor of the car's rear passenger side.  Reeves, Valentine, and Austin testified that defendant fired a gun at them from his backseat position during the chase following the robbery.  Although he could not identify defendant at trial, Donald also testified that the shots came from this same location.  A 32-caliber cartridge and cartridge holder were found by police in the area where defendant was seated.  In our opinion, this evidence and the reasonable inferences arising therefrom were sufficient to support defendant's convictions both of armed robbery and of larceny from a vehicle as either a principal or on an aiding and abetting theory.

(6/19/07 MCOA Op. at 1-3.)

While the state court did not cite *Jackson*, 443 U.S. 307, both of the state supreme court opinions upon which it relied for its standard of review, *People v Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992), and *People v Nowack*, 614 N.W.2d 78, 81 (Mich. 2000), expressly recognized and applied the *Jackson* standard.  Moreover, as required by *Jackson*, the court examined in detail each element of the respective offenses and the requirements for conviction as an aider and abettor.  The court held that, following the 1992 amendment of the statutes governing armed robbery and larceny from a motor vehicle, the use of a weapon during the flight from either offense was part of the offense itself.  The interpretation of a state statute is a matter of state law, and therefore is not subject to habeas review.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (holding that it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions");  *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  Moreover, even were that review properly before this Court, the state-court determination is a patently reasonable interpretation of the clear language of the statutes.

Finally, the state-court's application of the facts to the statutory requirements are fully supported by the record.  Multiple witnesses testified that Petitioner fired shots out the back window of the Jarvelle Thames' car as it was trying to escape after having stolen the radio and shorts

from Reeves' vehicle.  The state-court's determination therefore was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

II.      Equal Protection – Jury Selection

In his second ground for habeas relief, Petitioner argues that the prosecutor violated his right to equal protection, in violation of *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1991), when he used a peremptory challenge to strike an African-American juror.

In *Batson v. Kentucky*, 476 U.S. 79, 96 (1986), the Supreme Court articulated a three-step analysis to be applied to an Equal Protection Clause claim that purposeful discrimination occurred in the selection of the petit jury based solely on the prosecutor's exercise of his peremptory challenges at trial.  *See United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002).  First, the Defendant must establish a prima facie case of racial discrimination.  *See United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003).  This requires an initial showing that "the defendant . . . is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  *Batson*, 476 U.S. at 96 (citation omitted).  "[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"  *Id.* (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)).  Ultimately, the Defendant, relying on this presumption and other facts, must "raise an inference that the prosecutor used [the practice of peremptory challenges] to exclude the veniremen from the petit jury on account of their race."  *Id.*

Second, once the Defendant has raised the necessary inference, "the burden shifts to the state to come forward with a neutral explanation for challenging [potential] jurors."  *Id.* at 97.

- 20 -

"The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather it need only demonstrate that its reasons were race-neutral." *Copeland*, 321 F.3d at 599.  More specifically, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible.  'At this . . . step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

Third, the party opposing the strike must demonstrate that the prosecutor's purported explanation is merely a pretext for racial motivation.  *See McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 521 (6th Cir. 2001) (describing the *Batson* test).  Ultimately, the court must determine "whether the defendant has carried his burden of proving purposeful discrimination."  *Hernandez*, 500 U.S. at 359.  In making this determination, the Court presumes that the facially valid reasons proffered by the prosecution are true.  *Id.* at 359-60.  Racially discriminatory purpose or intent must be affirmatively shown by the opponent of the strike.  *Id.* at 360.  The ultimate burden of persuasion always remains with the opponent of the strike.  *See United States v. McFerron*, 163 F.3d 952, 955 (6th Cir. 1998).

Notwithstanding this three-part test, however, the Supreme Court has held that the question of whether a prima facie case has been established becomes moot once a court rules on the ultimate question under *Batson* of whether there was purposeful discrimination.  *Hernandez*, 500 U.S. at 360; *Lancaster*, 324 F.3d at 432-33.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of

- 21 -

intentional discrimination, the preliminary issue of whether the defendant had made a prima facie

showing becomes moot." *Hernandez*, 500 U.S. at 359; *Lancaster*, 324 F.3d at 433.

After reciting the *Batson* standard, the state court thoroughly analyzed the factual

record, applying the facts to that standard:

> After defense counsel raised his concern, the court allowed the prosecutor to articulate a race-neutral explanation for the challenge, which the court credited.  The prosecutor's race-neutral explanation was as follows:

>> The Court had inquired, your Honor, if it recalls about anyone who would've been upset with the police in the past, who were victims of crime, who did not have anything—nothing was done in result of arrest or prosecution and whether or not they were upset by that.  Two people raised their hands.  One was Mr. Melton . . . . The other was Mr. Cheney . . . .

>> When the Court pressed Mr. Cheney he said he wasn't sure.  He would try but he wasn't sure whether he could set aside the fact that he was upset with police in the past because of that event, the event being a breaking and entering.

>> Mr. Melton went on to give some answers with regard to, number one, he had sat on a murder jury before and came back with a guilty verdict.  Also he said he found it hard – that if a defendant did not testify, he would have – weigh that in his deliberations.  I was comfortable with Mr. Melton.

>> However, because Mr. Cheney had indicated he is upset with police and wasn't sure he could set that aside, and after consulting with my officer in charge, we . . . felt convinced that Mr. Cheney should be removed.

>> The record should also reflect that there are three other African-American jurors who are on this jury that I did not make any challenges towards.  It is not any issue involving race that was in my thought process but by the fact that this particular juror said he was upset with police and might not be able to set that aside.

> The court responded, "Well, the Court finds there's a racially neutral reason for the prosecutor to have exercised the peremptory."  Because the court addressed the ultimate question, the first step of the three-step analysis is moot.  *Knight*, *supra* at 338.

The prosecutor's explanation is facially race-neutral and therefore valid. *Id.* at 337. It is utterly unrelated to the prospective juror's race. Rather, it is tailored to the specific responses Cheney offered to questions raised by the court – namely, that Cheney indicated that his irritation with the police over not arresting the person(s) who broke into his home "might" influence his attitude as a juror. When specifically asked whether his "ability to be a fair and impartial juror" would be impacted, Cheney answered, "To tell you the truth, I don't know." "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v New York*, 500 US 352, 360; 111 S Ct 1859; 114 L Ed 2d 395 (1991). The prosecutor's explanation satisfies equal protection guarantees as a matter of law.

Defendant seems to imply in his brief on appeal that the prosecutor's articulated race-neutral reason was a pretext. In support, he attempts to draw a distinction between the prosecutor's handling of a Caucasian juror named Melton[1] and juror Cheney. In essence, defendant is arguing that because Melton should have been challenged, defendant's explanation of why Cheney was challenged is pretextual. This is a non sequitur, i.e., it does not follow that because one Caucasian juror was not challenged, the articulated race-neutral reason for the challenge of the African-American juror was pretextual.

Further, the implication that Melton should have been challenged by the prosecutor is at odds with the factual record. It is true that Melton had expressed dissatisfaction with the police's handling of the theft of his lawn tractor. However, unlike Cheney, when asked if his irritation with the police would carry over into the case at hand, Melton responded with an unequivocal "No." As for defendant's assertion that Melton had sat on a jury that found a defendant guilty of murder, there is nothing about this experience that in any way undermines the explanation given regarding Cheney. When asked if his prior jury experience would affect his ability to be fair and impartial, Melton again answered "No." Additionally, when Melton explained that he would be suspicious of a non-testifying defendant, the court immediately instructed the jury pool that they "should not hold it against the defendant in any way if he chooses not to testify." Accordingly, no clear error has been established and defendant's Batson challenge fails.

_____
[1] We note that defendant used one of his peremptory challenges to excuse Melton.

(MCOA Op. at 4-5.)

The state court accurately described the factual record and reasonably applied the *Batson* standard to those facts. As the court concluded, the first step of the *Batson* test was undisputed. Petitioner is a member of a recognizable racial group and the prosecutor used a

peremptory challenge to exclude potential juror Cheney, who was also African-American.  The prosecutor, however, clearly articulated a race-neutral reason for excusing Mr. Cheney.  That reason was fully supported by the record, and the state-court's acceptance of that reason as race-neutral was itself entirely reasonable.  Moreover, the state court reasonably determined that Petitioner failed to demonstrate that the prosecutor's proffered reason was pretextual.  Petitioner argued that pretext was shown because potential juror Melton responded similarly to Cheney, but was treated differently.  As the state court correctly concluded, however, Cheney and Melton responded very differently to the prosecutor's question about whether they could put aside their unhappiness with the police, which was the sole question relevant to the prosecutor's concern about potential bias against police witnesses.  The fact that Melton may have later expressed concern about whether he could refrain from making an inference from Petitioner's decision not to testify is not parallel to Cheney's case and is wholly irrelevant to the prosecutor's proffered reason for excluding Cheney.

In sum, the state court's analysis and determination of the issue was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, and it was based on an entirely reasonable determination of the facts.

### III.   Credit for Time Served

Petitioner argues that the state court violated his rights under the Equal Protection, Due Process and Double Jeopardy Clauses when it refused to give him credit on his new sentences for his time served prior to sentencing.

A variety of provisions of Michigan law are relevant to the sentencing of an individual charged and convicted of committing a new offense while on parole under the jurisdiction of the Michigan Department of Corrections.  First, under MICH. COMP. LAWS § 769.11b,

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

In other words, under Michigan law, a prisoner who has been held in jail on a charged offense for which he has been denied bond, is entitled to credit for time served against any sentence arising out of a conviction for that offense.  However, under MICH. COMP. LAWS § 791.238(2),

> A prisoner violating the provisions of his or her parole and for whose return a warrant has been issued by the deputy director of the bureau of field services *is treated as an escaped prisoner and is liable, when arrested, to serve out the unexpired portion of his or her maximum imprisonment. The time from the date of the declared violation to the date of the prisoner's availability for return to an institution shall not be counted as time served*.  The warrant of the deputy director of the bureau of field services is a sufficient warrant authorizing all officers named in the warrant to detain the paroled prisoner in any jail of the state until his or her return to the state penal institution.

*Id.* (emphasis added).  In other words, when the individual charged with a new crime is a parolee, he is not held in lieu of a bond on the newly charged offense.  *See People v. Idziak*, 773 N.W.2d 616, 623-24, 657 (Mich. 2009).  Instead, he is detained on the remainder of the sentence for which he was paroled.  *Id.* at 657.  Further, under MICH. COMP. LAWS § 768.7a(2),

> If a person is convicted and sentenced to a term of imprisonment for a felony committed while the person was on parole from a sentence for a previous offense, the term of imprisonment imposed for the later offense shall begin to run at the expiration of the remaining portion of the term of imprisonment imposed for the previous offense.

*Id.*  As a result, because a parolee who commits a crime is treated as an escapee and is held in jail on the remaining term of the sentence for which he was paroled, he receives credit for the time served in jail against any additional period of incarceration demanded by the parole board as penalty for the parole violation.  He does not receive credit for time spent in jail against the new conviction,

as he has not been held in jail with respect to that conviction. *See Idziak*, 773 N.W.2d at 623-24 (citing cases). The prisoner's new sentence is then imposed consecutively to the sentence from which he was paroled, as set forth by MICH. COMP. LAWS § 768.7a(2). The manner in which consecutive sentences are calculated are set by MICH. COMP. LAWS § 791.238(5), which provides as follows:

> A prisoner committing a crime while at large on parole and being convicted and sentenced for the crime shall be treated as to the last incurred term as provided under section 34.

MICH. COMP. LAWS § 791.238(5). Section 34(3), in turn, provides that

> If a prisoner other than a prisoner subject to disciplinary time is sentenced for consecutive terms, whether received at the same time or at any time during the life of the original sentence, the parole board has jurisdiction over the prisoner for purposes of parole when the prisoner has served the total time of the added minimum terms, less the good time and disciplinary credits allowed by statute. The maximum terms of the sentences shall be added to compute the new maximum term under this subsection, and discharge shall be issued only after the total of the maximum sentences has been served less good time and disciplinary credits, unless the prisoner is paroled and discharged upon satisfactory completion of the parole.

MICH. COMP. LAWS § 791.234(3). The Michigan Supreme Court, in interpreting these two provisions, has held that, when a prisoner commits an offense while on parole, his sentence on the new offense runs consecutively to the minimum term of the sentence for which he is on parole "plus whatever portion, between the minimum and the maximum, of the earlier sentence that the Parole Board may, because the parolee violated the terms of parole, require him to serve." *Wayne Cnty. Prosecutor v. Mich. Dep't of Corr.*, 548 N.W.2d 900, 906-07 (Mich. 1996) (interpreting MICH. COMP. LAWS §§ 768.7a(2), 791.234(3)). In practice, the Parole Board generally treats the time spent in jail pending conviction on the new offense as the additional portion between the minimum and

- 26 -

maximum on the earlier sentence that the parolee must serve as the consequence of violating his parole.

### A.      Double Jeopardy

In his first constitutional challenge, Petitioner contends that the court's failure to credit his time served against his new conviction violated his rights under the Double Jeopardy Clause.  The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  This clause protects against multiple punishments for the same offense.  *See United States v. Dixon*, 509 U.S. 688, 696 (1993); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled in part on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989); *Costo v. United States*, 904 F.2d 344 (6th Cir. 1990).  The protection against multiple punishments for the same conduct "is designed to insure that the sentencing discretion of courts is confined to the limits established by the legislature."  *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); *see also Jones v. Thomas*, 491 U.S. 376, 381-82 (1989).  It serves principally as a restraint on courts and prosecutors, not on legislatures.  *See Garrett v. United States*, 471 U.S. 773, 793 (1985) (no double-jeopardy violation when Congress intended to permit prosecution for continuing criminal enterprise after prior conviction for predicate offense); *Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983).  Therefore, when determining whether punishments are "multiple" under this aspect of the Double Jeopardy Clause, the court is bound by the intent of the legislature.  *Johnson*, 467 U.S. at 499; *Hunter*, 459 U.S. at 366-68.  In the context of sentencing, the Double Jeopardy Clause "absolutely requires that punishment already exacted must be fully 'credited' in imposing sentence upon a new conviction for the same offense."  *Pearce*, 395 U.S. at 718-19.

- 27 -

Petitioner acknowledges that he was on parole at the time he was sentenced. In accordance with the Michigan statutory scheme, Petitioner received no credit for time served on the new offenses; however, he was given jail credit toward the additional portion between the minimum and the maximum of his original sentence that the Parole Board required him to serve for his violation of parole. Petitioner nevertheless argues that the denial of credit for time served against his new sentence violates double jeopardy. He claims that, because the parole board did not hold a hearing to decide the duration of the parole-violation sanction, the time he served in jail was never credited against any period of sanction.

Petitioner's double jeopardy argument is meritless. The Michigan statutory scheme squarely contemplates that, once arrested for an offense, a parolee is treated as an escapee and held on the sentence from which he has been paroled. *See* MICH. COMP. LAWS § 791.238(2). The legislature has made it quite clear that it intended to punish persons who committed crimes while on parole quite differently than those who were not on parole at the time they committed their offenses. Contrary to Petitioner's argument, he received credit for time served as required by the Constitution and Michigan law, but that time was credited against the offense for which he was being held – the original conviction for which he was on parole. *See Idziak*, 773 N.W.2d at 628. The mere fact that the parole board elects to treat the actual period spent in jail as the appropriate period of sanction for the parole violation does not mean that Petitioner was denied credit for time served. Because Petitioner was given credit for time served against his sentence from which he was paroled. the refusal to grant credit against the new offense did not violate the Double Jeopardy Clause.

- 28 -

## B.        Equal Protection[1]

Petitioner next argues that his right to equal protection was violated by the state sentencing scheme, because, in practice, it results in unequal treatment of similarly situated defendants.[2]  Petitioner raised his argument for the first time in his motion for relief from judgment. As previously noted, the state court elected to address only the state-law claim, which it reviewed on the merits.  Because the state court expressly stated that it was considering both the state-law and constitutional claims together, this Court must presume that the trial court denied the constitutional claim on the merits and arguably would be required to decide the issue *de novo*, as the state appellate courts merely denied leave to appeal by invoking MICH. CT. R. 6.508(D).  *See Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010) (holding that brief form orders by the Michigan appellate courts invoking MICH. CT. R. 6.508(D) are unexplained orders within the meaning of *Ylst v.*

---

[1]Although Petitioner's claim states that both his equal protection and due process rights were violated, he makes a single argument that he was deprived of equal protection because he was treated in an arbitrarily different fashion from other similarly situated parolees.  Presumably, Petitioner's invocation of the Due Process Clause does not rest on a claimed deprivation of procedural due process, as he does not contend that he was deprived of constitutionally necessary procedures prior to being sentenced.  Instead, by relying on allegations of arbitrariness, he appears to invoke the substantive protections of the Due Process Clause.  The Supreme Court, however, repeatedly has held that, where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  In *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 200 (2003), the Court expressly held that "[t]hose who claim 'arbitrary' deprivations of nonfundamental liberty interests must look to the Equal Protection Clause," not the substantive protections of the Due Process Clause.  Petitioner's claim, therefore, must be analyzed only under the Equal Protection Clause.

[2]In his state-court appeals, Petitioner both raised the constitutional argument and argued that the state statutory scheme had been misapplied in circumstances like his own.  He does not raise the state-law argument in the instant habeas petition.  Petitioner's decision to eliminate his state-law claim was entirely appropriate, as such claims are not cognizable on habeas review.  Instead, this Court may only entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson v. Corcoran*, 131 S. Ct. 13, 14 (2010); *Bradshaw*, 546 U.S. at 76; *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

*Nunnemaker*, 501 U.S. 797 (1991), which are presumed to uphold or reject the last reasoned decision below).

While this case was pending before the Michigan Supreme Court, however, that court comprehensively addressed and rejected the identical claim raised by Petitioner. *See Idziak*, 773 N.W.2d at 628-31.[3]  As a consequence, this Court must presume that the analysis of *Idziak* was applied by the Michigan Supreme Court in denying leave to appeal to Petitioner.  That analysis is subject to deference under the AEDPA.

The Michigan Supreme Court conducted a thorough and detailed discussion of the Equal Protection Clause and its application to the Michigan sentencing scheme:

> Finally, defendant claims that denying credit toward a parolee's new minimum sentence violates due process[FN21] and equal protection guarantees because it results in unequal treatment of similarly situated defendants.[FN22] U.S. Const., Am. XIV, § 1; Const. 1963, art. 1, §§ 2 and 17.  We reject defendant's contention.

> FN21. The substance of defendant's argument focuses on equal protection; he does not separately address the requirements of due process.

> FN22. In his brief, defendant does not take issue with the DOC's practices, but with sentencing courts' denial of credit:  "Disparity is created not by the MDOC parole violation process, but by the judicial practice to date of denying jail credit to parolees who commit new crimes.  This practice is anchored by the belief that such offenders do receive credit, they just receive it somewhere else."

> The equal protection clauses of the United States and Michigan Constitutions are coextensive. *Harvey*, *supra* at 6, 664 N.W.2d 767. Unless the legislation at issue creates a classification based on "suspect" factors such as race, national origin, or ethnicity, which trigger the highest level of review ("strict scrutiny"), or factors such as gender or illegitimacy, which require an intermediate level of review ("heightened scrutiny"), it is reviewed under a rational basis standard. *Id.* at 7–8, 664 N.W.2d 767.  Defendant acknowledges that rational basis review applies here.

---

[3]The Michigan Court of Appeals denied leave to appeal from the order denying Petitioner's motion for relief from judgment on March 9, 2009.  The Michigan Supreme Court denied leave to appeal on October 26, 2009.  The supreme court issued its decision in *Idziak* on July 31, 2009.

Under rational basis review, "'the statute is presumed constitutional, and the party challenging it bears a heavy burden of rebutting that presumption.'" *Id.* at 7, 664 N.W.2d 767 (citation omitted). "To prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute." *Id.* (quotation marks and citations omitted). "'Rational-basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with "mathematical nicety," or even whether it results in some inequity when put into practice.'" *Id.* (citation omitted).

As is significant to each of defendant's constitutional arguments, parolees are situated differently from nonparolee criminal defendants and, as a result, they do not always enjoy the same "panoply of rights." See *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[T]he revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations."). A parolee is only conditionally permitted to leave prison on parole. Parole is "a permit to the prisoner to leave the prison, and not . . . a release," and "[w]hile at large, the paroled prisoner shall be considered to be serving out the sentence imposed by the court . . . ." MCL 791.238(6). He "remain[s] in the legal custody and under the control of the department." MCL 791.238(1). As this Court explained in *In re Eddinger*, 236 Mich. 668, 670, 211 N.W. 54 (1926), the purpose of a parole is to keep the prisoner in legal custody while permitting him to live beyond the prison enclosure *so that he may have an opportunity to show that he can refrain from committing crime*. It is a conditional release, the condition being that if he makes good he will receive an absolute discharge from the balance of his sentence; but if he does not make good he will be returned to serve his unexpired time. [Emphasis added.]

See also *Jones v. Dep't of Corrections*, 468 Mich. 646, 651, 664 N.W.2d 717 (2003) ("A prisoner enjoys no constitutional or inherent right to be conditionally released from a validly imposed sentence.").

Defendant claims that the denial of credit against a parolee's new minimum sentence results in unequal treatment in two ways: first, it creates a disparity between parolees and nonparolees because the latter are granted credit, while the former are not, and, second, it creates a disparity among parolees based on the decision to plead guilty and other "arbitrary" factors that affect the parolee's sentencing date.

The first claimed disparity arises from the application of the jail credit statute, MCL 769.11b. As we have explained, this statute does not apply to parolees upon their arrest for new crimes. Rather, parolees are granted credit against their earlier sentences for time served in jail under MCL 791.238(2). Thus, both parolees and nonparolees receive credit for time served. Defendant may prefer credit on his new

- 31 -

sentence, but this is not what the statutes require.  And it is entirely rational for the Legislature to treat parolees and nonparolees differently in this regard because parolees are continuing to serve out existing prison sentences after being granted mere conditional releases.

Second, defendant claims that denial of credit results in a disparity among parole violators based on the choice between a guilty plea and a jury trial, as well as other "arbitrary" factors, such as the degree of docket congestion.  No statute, including MCL 791.238(2), the jail credit statute, MCL 769.11b, and MCL 791.234(3), which sets forth the method for computing the new parole eligibility date, makes a distinction between a parolee who pleads guilty and one who chooses to go to trial.  Even if the Legislature had created such a distinction, the United States Supreme Court has stated that "there is no per se rule against encouraging guilty pleas" and has "squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea."  *Corbitt v. New Jersey*, 439 U.S. 212, 218–219, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978).  Moreover, this Court rejected a similar claim in *Prieskorn*, *supra* at 341–342, 381 N.W.2d 646:

> It may be that for defendants who find themselves incarcerated for multiple unrelated offenses, one of the motivations to plead guilty to some of the charges is the desire to accelerate the imposition of sentence in order to benefit, as much as possible, from Michigan's concurrent sentencing law.  But that ingredient of a given defendant's motivation derives from the peculiar facts with which the defendant facing multiple charges is confronted and not, we think, from limiting application of the sentence credit statute to those circumstances described by its terms.  We think it is clear that the Legislature sought, by the statute, to give a criminal defendant a right to credit for any presentence time served upon "the offense of which he is convicted."  Judicial obedience to the language of the legislation may, incidentally, indeed coincidentally, have the effect of motivating a defendant, who is charged with multiple offenses and who has posted bond for one offense and was released, but who is incarcerated for a second offense, to waive his right to trial and proceed to plead guilty in the first case in order to get the sentencing clock running on that conviction while awaiting final disposition of the offense for which he is denied bond, or final resolution of an unrelated "hold" or "detainer."  However, that motivation does not change the language of the statute and should not be judicial excuse for applying the statute to situations to which it does not extend.

To the extent the denial of credit against the new minimum sentence results in some parole violators reaching their parole eligibility dates earlier than others on the basis of "arbitrary" factors such as docket congestion or a judge's illness, this

- 32 -

does not amount to a violation of equal protection. Any difference in treatment does not arise from any classification created by the Legislature, and even when suspect factors are involved, a disparate impact created by facially neutral legislation does not necessarily amount to a violation of the Equal Protection Clause. See *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Further, because of parolees' unique status, defendant fails to meet the heavy burden of rebutting the presumption of constitutionality on this issue.

*Id.* at 628-30.[4]

The Michigan Supreme Court applied the applicable United States Supreme Court precedent. The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Because neither a fundamental right nor a suspect class is at issue in the instant case, the rational basis standard applies. *Davis v. Prison Health Servs.*, 679 F.3d 433 (6th Cir. 2012). Under rational basis scrutiny, there exists a strong presumption that the challenged law is constitutional. *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) ("A statute is presumed constitutional . . . and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.") (internal quotations omitted); *Graham v. Mukasey*, 519 F.3d 546, 551 (6th Cir. 2008). "[G]overnment action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)).

---

[4]The supreme court's decision continues for several additional pages with sample calculations under the statutes and responses to the dissenting justices. Those calculations and responses principally address competing interpretations of the sentencing scheme. As previously discussed, the proper interpretation of state law is not cognizable in a habeas petition.

The state court reasonably applied established Supreme Court precedent.  Petitioner falls far short of carrying his burden of overcoming the presumption of statutory constitutionality. First, Parolees are not similarly situated to non-parolees for purposes of equal-protection analysis. As federal courts in Michigan repeatedly have recognized, "[i]n the case of parolees who commit new crimes while serving a term of parole, the State has a legitimate interest in applying credit for time served to the remainder of the sentences for their previous offenses, that is, enforcing its laws in a way that protects its citizens from recidivists." *Franklin v. Curtin*, No. 2:08-CV-13274, 2010 WL 2232228, at *4 (E.D. Mich. May 27, 2010) (citing *Wiillavize v. Howes*, No. 1:09-cv-62, 2009 WL 4639483, at *4 (W.D. Mich. Dec. 2, 2009)).  Sentencing laws prescribing consecutive sentences for offenses committed on parole are clearly rationally related to that purpose.  *Id.* (citing *Holloway v. Trombly*, No. 05-cv-10276, 2009 WL 270166, at *9 (E.D. Mich. Feb. 3, 2009)).

Second, as the state supreme court recognized, a state's decision to treat those who plead guilty more leniently than those who proceed to trial does not violate the Equal Protection Clause.  *See Corbitt v. New Jersey*, 439 U.S. 212, 218-19 (1978) (reiterating that a state may encourage a plea agreement by offering substantial benefits for that plea) (citing *Brady v. United States*, 397 U.S. 742, 751 (1970)).  Such treatment is rationally related to the legitimate governmental purpose of encouraging the negotiation of plea agreements.  *Id.* at 222.

Further, Petitioner fails to show that any incidental distinctions in the ultimate sentences served by parole violators who choose to go to trial amounts to the sort of "intentional and arbitrary discrimination" described by *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As the Michigan Supreme Court recognized, even where a suspect class is in issue, mere disparate impact will not demonstrate an equal protection violation.  *See Washington v. Davis*, 426 U.S. 229,

- 34 -

242 (1976).  Here, the mere fact that similarly situated offenders who go to trial may ultimately serve somewhat different lengths of incarceration because of the timing of their trials is insufficient to show an equal protection violation.  Petitioner at no point alleges that such disparate impact is either the intent of the legislative scheme or the result of intentional discrimination in enforcement. *Olech*, 528 U.S. at 564 (requiring that any discrimination be both intentional and arbitrary).

For all these reasons, the Michigan Supreme Court reasonably applied established United States Supreme Court precedent to conclude that the Michigan sentencing scheme does not violate the Equal Protection Clause.

### IV.     Failure to Instruct Jury

In his fourth habeas ground, Petitioner contends that the trial court committed plain error when it failed to instruct the jury that it should view with caution the testimony of witnesses who would be accomplices to Petitioner's crime.  Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Rashad v. Lafler*, No. 09-2371, slip op. at 7 (6th Cir. Apr. 5, 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Here, Petitioner does not allege fundamental unfairness, nor could he.  As the trial court held in rejecting the claim, both Deantwan Sturgess and Jarvelle Thames testified that

Deantwan Sturgess, not Petitioner, fired the gun.  Their testimony in no way incriminated Petitioner.

Indeed, their testimony corroborated Petitioner's theory of the case.  As a consequence, the state

court reasonably determined that an instruction would not have benefitted Petitioner.  In sum, the

state court's rejection of Petitioner's fourth habeas ground was neither contrary to nor an

unreasonable application of established Supreme Court precedent.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Date:  July 11, 2012                                          /s/ Ellen S. Carmody
                                                            ELLEN S. CARMODY
                                                            United States Magistrate Judge




### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely
objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).